471 P.2d 265

**MARICOPA COUNTY, a political subdivision of the State of Arizona, Appellant,**

v.

**Bette Miller COWART, Appellee.**

**No. 9845.**

Supreme Court of Arizona,
In Banc.
July 10, 1970.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Westover, and James A. Teilborg, Phoenix, for appellant.

Gibbons, Kinney, Tipton & Warner, by Jack C. Warner, Phoenix, for appellee.

JACOBSON, Judge of the Court of Appeals.

The liability of Maricopa County for a suicide occurring in the Maricopa County Juvenile Home is presented in this appeal from a jury verdict and judgment in favor of the decedent's mother.

Plaintiff-appellee, BETTE MILLER COWART, instituted a wrongful death action against defendant-appellant, MARICOPA COUNTY, a political subdivision, to recover damages for the death of her son, CHARLES DENNIS METTINGER, age 15. (The deceased will hereinafter be referred to as "Dennis.") The matter was tried to a jury which returned a verdict in the plaintiff's favor in the sum of $35,000.00, judgment being entered thereon. Defendant's post-trial motions were denied and this appeal followed.

It would add little to this opinion to recite in detail the traumatic history of the deceased, and the pros and cons of the type of mother the plaintiff was, although a good deal of the trial time was devoted to this

type of testimony. Suffice it to say the deceased was a product of a broken home, the plaintiff having married five separate times prior to his death, and the deceased held rather deepseated resentments toward his mother which became manifest when he reached the age of 13. At this age he became rebellious, refused to apply himself to school work and refused to follow any authority. While Dennis and plaintiff lived in California, and at the suggestion of California school authorities, plaintiff sought counseling for Dennis, which proved ineffectual. In April of 1963, the parties moved to Phoenix, Arizona, where Dennis first came to the attention of police authorities on approximately May 1, 1963. On this date plaintiff called the Phoenix Police Department and reported that Dennis would not obey her orders and threatened her with a hammer. Plaintiff on this occasion requested that Dennis be taken to the County Detention Home. This request was complied with and he remained at the Home for approximately two days. Dennis was allowed to return to plaintiff's home with the understanding he comply with certain rules pertaining to school and obeying his mother.

On May 22, 1963, plaintiff again called the Phoenix City Police concerning Dennis' refusal to obey rules, which call resulted in his again being placed in the Detention Home. As a result of this detention a hearing was held in Maricopa County Juvenile Court which resulted on July 10, 1963, in Dennis being made a ward of the court and placed with an uncle. The deceased subsequently returned to live with his mother for approximately two or three days and then lived with the parents of an ex-husband of the plaintiff until he again ran away in September, 1963, while being prepared for registration in school. This last runaway resulted in Dennis' being committed to the Maricopa County Juvenile Home on September 12, 1963.

Prior to this time, Dennis had showed no suicidal tendencies. A psychiatric evaluation of Dennis was made on August 19, 1963, which disclosed no suicidal tendencies.

On September 18, 1963, Dennis was taken to the Maricopa County Hospital after he had informed personnel at the detention home that he had taken ten or eleven aspirin tablets. Treatment at the County Hospital consisted of giving him an antidote. He also informed detention home personnel at this time that he wished to die.

Both prior to Dennis' going to the County Hospital and subsequent to his return he had been kept with other juveniles at the detention home in large ward-type rooms. On September 25, 1963, Dennis was taken to the office of Dr. Lee S. Cohn for a further psychiatric consultation preparatory to obtaining his admission to a California psychiatric treatment center. While at Dr. Cohn's office he bolted and was not returned to the detention home until the following morning. While Dr. Cohn was unable to complete his examination of Dennis, he did conclude that he needed special psychiatric treatment. He did not consider that Dennis had immediate suicidal potentials but rather was of the opinion that Dennis' actions were directed outward toward others, rather than inward toward himself. However, he did concede at trial that in his opinion, Dennis did possess greater suicidal tendencies than a normal person. There is no evidence this latter conclusion was ever conveyed to personnel at the Detention Home.

After running away from the doctor's office, Dennis was again returned to the normal routine of the Detention Home. On that same day he again ran away from the Detention Home but was apprehended about twenty minutes later. On the following day, September 27, 1963, Dennis again made an attempt to escape from the home. Following this third escape attempt, a staff conference was called to determine what measures were to be taken concerning Dennis' conduct. Because of his repeated statements that he intended to kill his mother and his repeated escapes, the decision was made to confine Dennis. This confinement was in no manner precipitated by Dennis' prior alleged suicide attempt.

Confinement in this case consisted of placing Dennis in a six-foot by eight-foot room constructed of reinforced concrete, having one steel door with a small peep slot and one window which was covered by a steel plate except for one or two inches at the top. Furnishings in the room consisted of a double bunk bed, a toilet and washbasin. Light to the room was furnished by a recessed single bulb which was covered by a metal frame.

On September 29, 1963, after being confined for approximately two days, Dennis hung himself by a bedsheet wrapped around his neck and tied to the metal frame cover of the recessed light. Strangulation occurred by Dennis merely collapsing his knees and causing the bedsheet to become taut. All supervisory personnel of the home testified that the boys placed in confinement were checked on fifteen-minute intervals and that on the night of the suicide Dennis was so checked. On the other hand, a boy who was in a confinement room next to Dennis testified that Dennis had not been checked for over three hours.

The matter was submitted to the jury on two basic issues: (1) the negligence of the County in maintaining and constructing the detention facility; and (2) the failure of personnel of the detention home to adequately supervise the deceased, thus allowing him to take his own life.

The defendant raises several issues on appeal including the argument that the Maricopa County Detention Home is under the supervision of the Superior Court, and since the judges of the Superior Court are "state officers," the County would not be liable for the acts of state personnel. However, we need not decide this issue in reaching a determination in this matter, since a more basic obstacle confronts the plaintiff in this case and requires a reversal.

█ This obstacle can best be expressed by answering the question "what is the liability for suicide occurring in a juvenile detention home?"

Of course, before liability attaches there must be a breach of duty owed. Hersey v. Salt River Valley Water Users' Assn., 10 Ariz. App. 321, 458 P.2d 525 (1969). In those cases in which a *specific* duty of care is absent, that is cases involving a wrongful act by the defendant and a subsequent suicide by the injured party, the almost universal rule is that the suicide by the injured party is a superseding cause which is neither foreseeable nor a normal incident of the risk created and therefore relieves the original actor from liability for the death resulting from the suicide. Tucson Rapid Transit Co. v. Tocci, 3 Ariz.App. 330, 414 P.2d 179 (1966); Annot., 11 A.L.R.2d 751, at 757 (1950).

██ While plaintiff tacitly agrees with this general principle, she argues that a different rule is applied in "institutional" suicide cases where a *specific* duty of care to avoid suicide is imposed. This rule has been applied in both general and mental hospital cases and in cases dealing with mental institutions of various kinds. However, neither counsel has cited, nor has the court on its own research been able to find, a case where a specific duty of care has been imposed upon a juvenile detention home. This does not mean that such a specific duty of care should not be imposed. A reading of many "institutional" cases leads us to the conclusion that a juvenile detention home must, in the care of the juveniles placed in its custody, exercise such reasonable care and attention for their safety as their mental and physical condition, *if known*, may require. See Wood v. Samaritan Institution, 26 Cal.2d 847, 161 P.2d 556 (1945) and cases cited therein. This does not, however, mean that plaintiff is relieved from proving that the defendant failed to conform to the standard required. See Restatement (Second) of Torts § 281 (1965). Since the duty in this case is imposed because of the type of institution involved, the standard required for the protection of juveniles placed in its custody is that the institution exercises the skill and knowledge normally possessed by like institutions in similar communities handling juveniles. See Boyce v. Brown, 51 Ariz. 416, 77 P.2d 455 (1938); Stallcup v. Cos-

carart, 79 Ariz. 42, 282 P.2d 791 (1955); Reliable Electric Co. v. Clinton Campbell Contractor, Inc., 10 Ariz.App. 371, 459 P.2d 98 (1969). Just as a general hospital would have a different standard of care for its patients with mental disorders than a hospital specializing in mental disorders, (*see* Mesedahl v. St. Luke's Hospital Ass'n of Duluth, 194 Minn. 198, 259 N.W. 819 (1935)), a home for wayward juveniles would have a different standard of care than that imposed upon a general hospital which might have patients with mental disorders.

■ Plaintiff's case was based upon two theories, that is, negligent construction of a physical plant and lack of supervision. It is essential to plaintiff's case that the evidence establish the standard of care both as to construction and supervision in order to justify submission of the case to jury under instructions allowing recovery on either of these theories. A reading of the transcript shows a complete absence of any testimony establishing a standard of care as to the *supervision* required of juveniles such as are detained in the Maricopa County Juvenile Home. We do not believe that this is a matter of such general knowledge in the community as to negate the necessity of testimony on the subject. The general education and background of the personnel, the number of employees as compared to the number of inmates, the type of supervision—that is, security supervision or honor supervision—the number of personnel having specialized education in social rehabilitation, psychology and social sciences, the activities of the inmates, the number of night personnel as compared to daytime personnel, the routine of personnel in checking inmates, the lack of or presence of supervisory personnel, and the type of facilities where supervision can be conducted,—these and other factors would all go to establishing the standard of care and defendant's violation of that standard. A listing of these elements suffices to show that this type of knowledge is not general to the community. We therefore hold that the plaintiff, having failed to establish a standard of care required of the defendant in its supervision of juveniles, may not hold the defendant liable for an alleged failure of, or negligence in, such supervision of the deceased.

■ As to plaintiff's theory of negligent construction or maintenance, a different problem is presented. The following took place on plaintiff's cross-examination of one of defendant's expert witnesses:

"Q  I wish to tell you, sir, that the evidence shows that the room portrayed there is only about double the width of the bed on the wall, and that this boy was placed in there on about two days before he hanged himself from the cross-bars above the—in the cell's roof, and that the door was locked, kept locked. Now, does your training and experience, sir, has that dealt with the proper containment of detention or housing of young boys say 15 years old such as Charles Dennis Mettinger?

"MR. WESTOVER: We object, if the Court please. The standard here is not a matter of expert testimony.

"THE COURT: Objection will be sustained.

"Q  BY MR. WARNER: Doctor, do you believe that that facility shown in the exhibits that you are looking at was proper housing for Dennis Mettinger?

"MR. WESTOVER: This is the third time, if the Court please, counsel has asked the same question in different form. We make the same objection.

"THE COURT: State your objection, I will rule.

"Objection will be sustained.

"Q  BY MR. WARNER: Now, Doctor, in your business you have come into contact with various ways in which housing facilities might be constructed and designed for the housing of boys with emotional problems, have you not?

"A  Yes.

"Q  And you are familiar with what is conceived to be good for the housing of

them and what is conceived to be bad and improper, are you not?

"MR. WESTOVER: Same objection, if the Court please.

"THE COURT: Objection will be overruled. He may state.

"THE WITNESS: Yes.

"Q BY MR. WARNER: Doctor, in your opinion is the housing portrayed in the exhibits before you good housing, adequate and suitable for the housing of boys with emotional disturbances such as Dennis Mettinger had?

"MR. WESTOVER: Same objection, if the Court please, it is not a matter of expert testimony.

"THE COURT: Objection will be sustained."

It is apparent that plaintiff was attempting to establish a standard of care of construction and design utilized in the housing of emotionally disturbed juveniles, and that defendant objected to such testimony on the grounds that such was not the proper subject of expert testimony and was sustained therein. While we do not agree with either defendant's counsel or the court in its sustaining of the objection, we do hold that under such circumstances, the defendant waived proof of such a standard of care in construction.

However, under the general theory of negligence, in order to show liability, the plaintiff must prove a causal connection between the alleged breach of duty and the resulting injury. Here again, the proof is nil that any breach of the detention home's duty to provide a reasonably safe building, if in fact such a breach was shown, was the proximate cause of the resulting suicide of the deceased. There was absolutely no testimony that the structure produced or contributed to a morbid state of mind of the deceased precipitating his suicide. While the plaintiff argues that the construction of the confinement room hampered adequate supervision of the deceased, we have held that plaintiff may not rely on

this supervision aspect of liability because of the failure of proof of a standard.

Since our decision in this matter requires a reversal, we need not consider the other alleged errors raised by the defendant.

For the foregoing reasons, the judgment of the trial court is reversed and this matter is remanded with directions to enter judgment for the defendant.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and McFARLAND, JJ., concur.

Note: Justice JACK D. H. HAYS, having requested that he be relieved from consideration of this matter, Judge EINO M. JACOBSON, Court of Appeals, was called to sit in his stead and participate in the determination of this decision.