CHARLES LESTER PORTER, Plaintiff-Appellee, v. THE COUNTY OF COOK, Defendant-Appellant.

First District (3rd Division)   No. 61628

Opinion filed September 7, 1976.

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner and Donald P. Smith, Assistant State's Attorneys, of counsel), for appellant.

Sidney Robin, Nicholas Stevenson, and Jack K. Levin, all of Chicago, for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Charles Porter was seriously burned while confined in the Cook County House of Correction. He sued the County for negligence, and in a nonjury trial was awarded a judgment for $117,500 from which the County has appealed.

Porter, who had a history of mental illness, came home drunk on January 2, 1971, threatened to harm his wife physically and chased her around the house. A neighbor heard her screams and called the police who arrested Porter. The next day he was brought to court and his case was continued to January 21. An order was entered that he be examined in the meantime at the Psychiatric Institute—an adjunct to the Circuit Court of Cook County where psychiatric examinations are performed on defendants awaiting appearance before the court. The examination was conducted on the morning of January 7 by Dr. Gerson H. Kaplan, a psychiatrist employed part-time by the County. Kaplan filled out two forms: a psychiatric summary and a certificate of need for hospitalization. In the certificate Kaplan stated that he had personally examined Porter and found that he was "hearing voices. Believes people are after him. Alcoholic, taking pills, shaky." He found that Porter was "in need of mental treatment" and recommended "that he be admitted to a hospital immediately as an emergency for the protection from physical harm of himself or others."

Kaplan advised Porter to go on "sick call" (that is, seek medical assistance at the House of Correction) and, after completing his examination at 10:30 a.m., assigned a guard to take him to the institution's doctors. He was taken to the doctors' office before being escorted to his cell. Although Porter's medical records were not available at the trial it appears from the trial record that he informed a doctor that a drug called "thorazine" had been prescribed to allay his mental disturbances and he requested that he be given some of these pills. The doctor said that this would be done.

It is unclear what happened to Kaplan's certification. Normally, the guards bringing an inmate from and returning him to the House of Correction would be cognizant of the doctor's recommendations and would transmit them to the proper personnel at the correctional institution. There was no proof, however, that this was done in Porter's case. Despite this, Walter Sullivan, a lieutenant of guards at the House of Correction, who had had some psychiatric training, observed Porter at lunch on the same day that Dr. Kaplan examined him and came to the

independent conclusion that he should be segregated from other prisoners. At noontime, Sullivan prepared a conduct report which stated: "Porter was placed in segregation for safekeeping. Above subject constantly talks to himself, appears very apprehensive, states he hears voices and people are trying to kill him. Above subject not violent but his unusual actions causes concern amongst other inmates."

The cell Sullivan assigned to Porter was about six feet by six feet and the cells on either side of it were unoccupied. The cell door had a little window through which the guards, who made their rounds every half hour, could peer. He was permitted to smoke and retained his cigarettes and matches.

Porter had his last meal of the day in another room under guard supervision. After he was locked in his cell, he began hearing voices that threatened him. He yelled for the guards to come to his aid and for medication. None came. The voices kept getting worse and worse. He thought that smoke would drive the voices away and decided to set his mattress on fire. The smoke and fire made it difficult for him to breath and he moved the mattress away from the door in an attempt to get some air. But his hair caught fire and he started screaming. Finally, a guard from two tiers above his cell rescued him, but not before he had suffered severe burns on his face and on his hands which ultimately resulted in the amputation of the four fingers of his right hand and the little finger of his left hand.

The County has attacked the judgment of the trial court on three grounds: first, that Porter never showed that the County breached any duty it owed him; second, that the County was immune from liability for the alleged negligent acts, and third that Porter was guilty of contributory negligence in waiting until January 7 to request medication.

It has been held that a village and its police officers and jailers must exercise reasonable and ordinary care for the life and health of prisoners. Whether the village and its employees have failed to act in accordance with this duty is an issue for the trier of fact. (*Dezort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, 342 N.E.2d 468. See also *Thornton v. City of Flint* (1972), 39 Mich. App. 260, 197 N.W.2d 485; *Lavigne v. Allen* (1971), 36 App. Div. 2d 981, 321 N.Y.S.2d 179.) There is no reason why this standard of care should be less applicable to a county than to a village.

■■ One of the issues at the trial, relating to the question of whether the County employees acted reasonably in their treatment of Porter, was whether the jail guards knew of Dr. Kaplan's certification. As we have mentioned, there was no proof that the guards saw his certification and any knowledge they might have had can only be inferred. Dr. Kaplan testified that he believed that the personnel in charge of Porter would

have known of his condition because of his practice of telling them about his findings, but he had no specific recollection of informing them of Porter's condition. On the basis of Dr. Kaplan's testimony about his customary procedure, the trial court concluded that the guards saw the medical reports and that Dr. Kaplan undoubtedly informed them of Porter's condition. These inferences reflect a debatable, though not unreasonable evaluation of the evidence. There is certainly no evidence contradicting these findings, and they must be sustained. In a trial without a jury the judge has the responsibility of determining the credibility of witnesses and the weight to be accorded their testimony. His decision will only be disturbed when it is against the manifest weight of the evidence. *Landfield Finance v. Feinerman* (1972), 3 Ill. App. 3d 487, 279 N.E.2d 30.

Another issue pursued at the trial concerned the usual and customary procedures governing an inmate in Porter's condition. Lieutenant Sullivan testified that he often assigned prisoners to segregation simply because their actions might affect the rest of the inmates, 40 percent of whom had mental problems of some sort. He stated that he had no authority to remove articles from a segregated prisoner with which he might hurt himself, such as matches or cigarette lighters. His understanding was that only a doctor could order such articles taken away from the prisoner. He further stated that a prisoner would be sent to isolation with nothing but shirt and pants if a psychiatrist found that he should be transferred immediately as an emergency for protection from physical harm to himself and others. Sergeant Rayfield Thompson, the guard in charge of the segregation unit in which Porter had been placed, agreed that an inmate who was certified and in Porter's condition was almost always hospitalized immediately; but he contradicted Sullivan's testimony by saying that an inmate placed in segregation who might harm himself or others was usually searched and stripped of matches or lighters. Starling Hightower, the guard who rescued Porter, corroborated Thompson's testimony concerning their power to search and seize matches. However, when cross-examined, he stated that it was not the routine procedure to remove matches or lighters from inmates who complained of hearing voices, talked to themselves or appeared to be apprehensive. It was otherwise if there was some indication that an inmate was potentially suicidal.

Two doctors testified concerning the proper care to be given one in Porter's condition. Dr. Benjamin Kesert, a specialist in psychiatry and neurology, was called as an expert witness by the plaintiff. He testified that the customary cautionary procedures in Chicago area hospitals with psychiatric units were to have patients in Porter's condition (paranoia due to alcoholism) watched continuously, stripped of their personal effects and dressed in a hospital gown with the cord removed, and placed in a

room with no overhanging pipes. Dr. Robert Reifman, an assistant director of the Psychiatric Institute of the Circuit Court of Cook County, was the defendant's expert witness. When asked what should have been done with an inmate in Porter's condition, he explained that he had no opinion. In view of Dr. Kesert's testimony and Dr. Reifman's failure to contradict it, the evidence in this case runs directly opposite to that in *Dimitrijevic v. Chicago Wesley Memorial Hospital* (1968), 92 Ill. App. 2d 251, 236 N.E.2d 309—a case which the defendants urged the trial court to follow—where a hospital failed to transfer a psychiatric patient to a security area before he jumped from a window to his death. A wrongful death action was brought against the hospital and the treating doctors. In *Dimitrijevic*, the medical testimony supported the inference that the doctors were diligent and skillful and that the hospital's procedures in handling the deceased contravened none of the prevailing standards for care of psychiatric patients.

■■ ■ At the trial's conclusion the court found the defendant's employees negligent and assessed the plaintiff's damages at $117,500—a figure not questioned in this appeal. The court specifically noted that the testimony of Dr. Kesert was uncontradicted and concluded from this testimony that the basic standard of the community dictated that a man in Porter's condition should have had his clothes and other personal articles taken away from him and should have been dressed in a hospital gown. By way of contrast, the County admitted that its jail facility had no written standards to guide its personnel in the handling of prisoners diagnosed by a psychiatrist as needing protection to avoid physical harm to themselves or others. Moreover, the County presented no evidence, expert or otherwise, indicating that the procedure testified to by Dr. Kesert would have been inappropriate in a correctional institution. Upon this record we see nothing unreasonable in the standard of care applied by the trial court, and nothing unreasonable, accepting this standard, in its factual determination that the County and its employees, obligated to provide reasonable care for their prisoners, did not do so when they failed to strip Porter, take away his personal effects and protect him from himself. And this is true regardless of the usual and customary procedure followed in the House of Correction. The court's conclusion was consistent with the manifest weight of the evidence, and it is the rule of appellate procedure that a factual determination by a judge in a trial without a jury will not be upset on review unless it is against the manifest weight of the evidence. *Liberty Mutual Insurance Co. v. Gordon* (1968), 94 Ill. App. 2d 90, 236 N.E.2d 377.

■■ The County objects to the trial judge's finding on the ground that Porter was guilty of contributory negligence. The negligence alleged is not in his starting the fire, but his delay in requesting his prescribed

medication coupled with his knowledge of the consequences. One of the elements necessary to a plaintiff's cause of action in a personal injury suit is proof that he exercised due care for his safety. (*Snyder v. Robert A. Black, Inc.* (1964), 53 Ill. App. 2d 327, 203 N.E.2d 1.) In determining whether the plaintiff did so, the trier of fact must take into account the age, experience and mental capacity of the injured party at the time of the injury. (*Noel v. McCaig* (1953), 174 Kan. 677, 258 P.2d 234; see also *Dezort v. Village of Hinsdale.*) Porter's mental illness was of long duration. In 1970 he was hospitalized several times at the Chicago-Read Mental Health Center where thorazine was prescribed for him. He was directed to take this tranquilizer to calm his nerves and arrest his hallucinations. Porter received no medication at the House of Correction between January 3, 1971, and January 7. On the morning of the 7th he requested medical attention, but he was sent to the psychiatrist before being taken to a doctor at the House of Correction. Porter testified that he told the doctor that he was hearing voices and that he took thorazine to drive them away; the doctor replied that "it would be taken care of." At lunchtime he asked one of the guards for medication and began screaming for his pills that night just before he set fire to his mattress. There is no evidence that he was given medication at any time on January 7. Although the trial court never made a specific finding that Porter exercised due care for his own safety, the court's judgment in favor of the plaintiff implies that the court believed this to be the case. And when the evidence concerning Porter's mental state and his efforts to obtain medication are considered, there are ample grounds supporting the court's implicit conclusion that Porter was not contributorily negligent.

The County also contends that, if Porter has a cause of action at all, it is one of malpractice against Dr. Kaplan rather than one of negligence against the County. This contention implies that Kaplan either failed to realize the urgency of Porter's mental illness or failed to prescribe the proper remedy. Kaplan testified that he was not particularly concerned that Porter might harm himself; his concern was that Porter would be of physical danger to others. He said that the recommendation in his certification that Porter be admitted to a hospital immediately for the protection from physical harm to himself or others, meant that Porter should be sent to a State mental hospital for psychiatric evaluation the day after his certification—that this was the standard procedure. He stated that he used the word "immediately" with the realization that Porter would not be taken to the State hospital until the following day; that if he had felt that waiting 24 hours would be a significant problem he would have ordered hospitalization at the Cermak Memorial Hospital—a medical facility affiliated with the House of Correction—for the intervening 24 hours.

The County's argument that this is a case of malpractice rather than negligence is apparently grounded on the theory that Kaplan was not a County employee. However, this theory overlooks Kaplan's undisputed testimony that he was employed by Cook County.

The County's last argument is that it was immune from liability under the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 1—101 *et seq.*) and under well-defined principles of public official (quasi-judicial) immunity. This defense was never raised by the County in its answer, at trial, or in its motion for a new trial. In fact, one of the County's lawyers stated during closing argument that, "The County of Cook can be held liable for the negligence of its agents and employees." Even after the trial court, in considering the defendant's motion for a new trial, referred to section 4—105 of the Act, the County did not claim that it was immune from tort liability. The failure to raise the immunity defense in the trial court precludes the County from developing it here. *Flodberg v. Whitcomb* (1967), 79 Ill. App. 2d 320, 224 N.E.2d 606.

The judgment is affirmed.

Judgment affirmed.

McNAMARA and McGLOON, JJ., concur.