356 So.2d 94 (1978)
Mrs. Clarissa BROUSSARD
v.
The STATE of Louisiana Through the DIVISION OF HOSPITALS et al.
No. 11780.
Court of Appeal of Louisiana, First Circuit.
February 13, 1978.
Rehearing Denied March 20, 1978.
Writ Refused May 12, 1978.
Dennis R. Whalen, Joseph R. Raggio, Baton Rouge, of counsel for plaintiff-appellant Mrs. Clarissa Broussard.
Donald E. Puckett, Baton Rouge, of counsel for defendant-appellee The State of La., through Division of Hospitals et al.
Before BLANCHE, COVINGTON and CHIASSON, JJ.
BLANCHE, Judge.
Plaintiff, Clarissa Broussard, is appealing the quantum awarded for the suicide death of her son; and the defendant, the State of Louisiana, through the Division of Hospitals, has answered the appeal asking that the trial court judgment be reversed.
Plaintiff's son, Joseph Carl Broussard, was committed to East Louisiana State Hospital by Dr. Hypolite Landry on August 5, 1974, and remained there from August 6, 1974, until September 1, 1974, when he committed suicide by using a tie from a robe to hang himself. The trial court found negligence on the part of the defendant and awarded the sum of $15,500 to plaintiff. We reverse.
A reading of the record compels us to agree with the trial judge when he stated in his Written Reasons for Judgment:
"The evidence demonstrates without serious dispute that the authorities and personnel of the hospital were aware that Broussard had a serious mental condition, and that by history, he had suicidal tendencies. * * *" (Record, pp. 66, 67)
Dr. Francisco A. Silva, Deputy Coroner, testified that Broussard's history of two attempts at suicide and his personal observations caused him to concur with Dr. Landry in committing Broussard to East Louisiana State Hospital. Mrs. Doris Calcote, a nurse at East Louisiana State Hospital, when asked if Broussard were suicidal, testified:

*95 "Yes, there was a note that I think had come from the Coroner that he had a razor blade on his way to the Coroner's office and wanted to do something with that, but I think he had changed his mind, or something to that effect, and, also, the psychiatrist's evaluation stated that he was suicidal." (Record, p. 167)
We also find, as did the trial judge, that the record further shows the hospital personnel closely monitored Broussard's activities and attempted to supervise him properly in view of his known condition. Next, we reach the question rhetorically stated by the trial judge:
"* * * Thus is raised the critical and decisive issue in the lawsuit which is whether the hospital, through its personnel, exerted reasonable efforts to keep the means of self-destruction from the patient's grasp." (Record, p. 67)
Mrs. Calcote testified in her deposition that it was against hospital policy to issue a robe with a tie to a suicidal patient, and this was corroborated by another nurse, Jimmie Rae Morgan. Dr. Terry Charles Philastre, who was on duty at the time of Broussard's death and attempted to resuscitate him, reconstructed what caused his death:
"My conclusion was that he had probably tied some kind of a cloth, something made of cloth or[he did not recall its precise nature] * * * It was something that was long enough to allow him to tie it to a far rail of the bed * * * and then to his own neck and to sit or kind of like a sitting motion off of the side of the bed." (Record, p. 184)
Dr. Philastre also testified that the Joint Committee on Accreditation of Hospitals required privacy screens around the beds of patients and that these privacy screens were installed at the time of Broussard's suicide. In his opinion, this increased the problem with patient security in a mental ward. Aside from Dr. Philastre's testimony, the autopsy report revealed that Broussard used a tie from a robe to kill himself.
Despite the absence of evidence that Broussard was actually issued a robe with a tie, the trial judge concluded that it became available to him. The trial judge found that it was reasonable for the hospital personnel to anticipate that a person with known suicidal tendencies would use such an object to terminate his life and, accordingly, should have removed the possibility of his access to the object. Reluctantly reaching the decision that the defendant was negligent, the trial judge stated:
"* * * Although the result seems obviously unfair, it must be understood that the State undertook the responsibility for his care, and further, in view of his mental instability, he cannot be held accountable for his own actions." (Record, p. 69)
We agree with the remarks of the trial judge but find that his judgment virtually makes the State an insurer of the patient's safety when their duty is only one of reasonable care. In this regard we do not find that the hospital failed in its duty to use reasonable care, as will be explained more particularly hereinafter.
This duty must necessarily be balanced and reconciled with the hospital's duty to restore the patient to a state of health where he will no longer be suicidal. The manner in which these duties are discharged is within the sound discretion of the medical authorities and would range, depending on the condition of the patient, to the extreme of placing him in complete restraint to the point where only minimum restriction and supervision would be required.
At the time of Broussard's death, he had been in the hospital for over three weeks and had been placed in the infirmary due to a toxicity that developed as a resulted of taking certain medication. The hospital record shows that on the evening prior to his death he was in the lobby of the hospital trying to pick a fight and was placed in soft restriction. The following morning the head nurse in the hospital's infirmary area observed him approximately every half hour during the time she came on duty at 7:00 A. M. until she went to lunch and noticed him ambulating about *96 the ward and into the lobby area. She testified that the restraint of the patient at that time was not necessary.
There is testimony from practically all of the medical experts that if a patient is bent on committing suicide, it is practically impossible to prevent such an occurrence. In this connection, the testimony is that the usual articles of self-destruction such as knives, razor blades and other obvious instruments are removed from the patient or he is prevented from having access to such objects; but without either constant restraint or constant observation, it is practically impossible to prevent one from committing suicide if he really wants to do so.
Furthermore, the medical testimony indicates that to keep one in constant restriction would make the environment for the patient like a concentration camp and would be counterproductive to his mental improvement.
It is also a fact that while in the infirmary the patient cannot be kept under constant observation at all times because of the privacy screens placed around each bed. While plaintiff was concealed by such a screen, he fastened a robe tie around his neck and committed suicide.
Thus, when all of the facts and circumstances are taken into consideration, we do not believe that the hospital breached its duty toward the plaintiff's son because in some unexplained manner he was able to obtain possession of a robe tie. In our view, the hospital exercised reasonable care to prevent his suicide and it was not unreasonable under the circumstances to permit him to be with other patients where he might obtain a robe tie. There is no proof that the hospital issued a robe to him with a tie, and their observation of Broussard in the infirmary preceding his death was reasonable for his safety.
Since the plaintiff failed to prove a breach of duty, we must reverse the judgment of the trial court and dismiss plaintiff's suit at her costs.
REVERSED AND RENDERED.