No. 14519

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

REGINA. PRETTY ON TOP, as surviving
spouse, and DOROTHY MARCHINGTON,
Administratrix of the Estate of MELVIN
PRETTY ON TOP, Deceased,

        Plaintiffs and Appellants,

  -vs-

CITY OF HARDIN, MONTANA and ROBERT HAMILTON,
chief of police of the City of Hardin, Montana

        Defendants and Respondents.

---

Appeal from:  District Court of the Thirteenth Judicial District,
            Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellants:

        Lynaugh, Fitzgerald, Schoppert, Skaggs, and Essman,
         Billings, Montana
        Thomas J. Lynaugh argued, Billings, Montana

    For Respondents:

        Keefer and Roybal, Billings, Montana
        J. Dwaine Roybal argued, Billings, Montana

---

             Submitted:  February 13, 1979

               Decided:  APR 1  1979

Filed:

_Thomas J. Kearney_
                   Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

On the afternoon of September 18, 1973, Hardin City patrolman Harvey Kern observed three men sitting in a truck behind the Big Horn Bar in Hardin, Montana. They were passing a bottle from one person to another. Patrolman Kern watched the men for approximately fifteen minutes before one of the men got out of the truck and left the scene. The patrolman then approached the vehicle and informed the occupants of the city ordinance which prohibited public possession of an open bottle containing an alcoholic beverage. After informing the men of their rights, patrolman Kern arrested them and took them to the Hardin City Jail where they were searched and incarcerated.

One of the men was Melvin Pretty On Top, a Native American. He had been arrested numerous times in the past for alcohol-use offenses. On this occasion it appeared to the patrolman that Pretty On Top had been drinking, but that he was in control of his body. He did not stagger and he was coherent.

On the morning after his arrest, Pretty On Top pleaded guilty to the open-bottle charge. The Police Court imposed a $100 fine. Because Pretty On Top was unable to pay the fine, he was returned to the jail to serve time at a rate of $10 per day.

The Hardin City Jail is used almost entirely for detoxification. Of the 300 persons incarcerated in the jail for a twelve month period immediately preceding September 1973, 98 percent were jailed on alcohol-use

offenses. Of these offenders, 95 percent of those jailed were Native Americans. The jail is inspected, but not searched, numerous times each day by the police chief and the officers on duty. Visiting hours are from 8:00 a.m. until 4:00 p.m. Visitors are permitted to go back to the cell and talk to prisoners through the bars. Before doing so, the visitor is asked to remove his coat and leave behind packages, but a search of the visitor is not made. Overall, the security maintained by the authorities depends on the jail population. Since the jail is used primarily for detoxification, minimum security is usually maintained.

On September 22, at 6:03 p.m., four days after his arrest, Melvin Pretty On Top committed suicide by stabbing himself in the throat, neck and chest with a wooden paring knife. None of the authorities knew how Pretty On Top obtained the knife or how long he possessed it prior to his death. However, one of the trusties (a prisoner who receives $5.00 credit each day for doing janitorial work in the cell and reporting anything unusual to the officer on duty) knew that Pretty On Top had the knife in his possession, but failed to inform anyone.

Pretty On Top's wife, Regina, had asked to see her husband approximately one hour before his death, but her request was denied because visiting hours had ended. This was the only record of anyone attempting to visit Pretty On Top.

Hardin City Police Chief Robert Hamilton observed Pretty On Top each day before his death during inspections. His general demeanor, attitude and activities were normal. Pretty On Top did not have a history of mental disease or emotional disturbances, nor had he attempted suicide previously.

On January 2, 1974, Regina Pretty On Top and the administratrix of Pretty On Top's estate (plaintiffs) filed a complaint in District Court, Big Horn County, alleging that Pretty On Top's death was caused by the negligence of defendants City of Hardin and Police Chief Robert Hamilton in failing to exercise due care in the maintenance and supervision of the jail facility.

On October 28, 1975, defendants moved for summary judgment, stating:

> "The City of Hardin and Robert Hamilton submit that the undisputed facts do not support any theory of liability and therefore they are entitled to judgment as a matter of law. Three independent and equally supportable reasons are here presented in support of motion for summary judgment.
>
> ". . .
>
> "1. The defendants breached no duty owed to the deceased.
>
> "2. The suicide of Melvin Pretty On Top was not foreseeable by any defendant.
>
> "3. The suicide of Melvin Pretty On Top was his own volitional act and as such was a sufficient superceding and intervening act to cut off responsibility for any negligence of the defendant."

An order granting defendants' motion for summary judgment was entered by the District Court on September 20, 1978, and this appeal followed.

The ultimate issue to be decided in this case is whether the summary judgment is proper.

A party against whom a claim is asserted may, at any time, move for summary judgment in his favor. Rule 56(b), Mont.R.Civ.P. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(c), Mont.R.Civ.P.

-4-

The party moving for summary judgment has the
burden of establishing the absence of any genuine issue
of material fact and the party opposing the motion must
come forward with evidence supporting the existence of
a genuine fact issue.  Hollinger v. McMichael (1978),
_____ Mont. _____, 580 P.2d 927, 35 St.Rep. 856.

In the case before us, the District Court considered
the pleadings, depositions, answers to interrogatories,
and the parties' briefs before granting defendants' motion
for summary judgment.  For purposes of testing the
propriety of the summary judgment, defendants do not
dispute the material facts found in the court's file.
Those material facts are set forth above.

Actionable negligence arises only from a breach of
legal duty, and to sustain an action for damages resulting
from negligence, the complaint must allege the duty, its
breach, the damages, and that the breach of duty was the
proximate cause of the injury.  Ritchie v. Northern Pac.
Ry. Co. (1954), 128 Mont. 218, 272 P.2d 728.  Related to
these basic rules of negligence law is the rule that a
defendant who could not reasonably foresee any danger of
direct injury resulting from his conduct or any risk from
an intervening force is not negligent.  Mang v. Eliasson
(1969), 153 Mont. 431, 458 P.2d 777.

A jailer owes a duty to the prisoner to keep him safe
and to protect him from unnecessary harm.  Reasonable and
ordinary care must be exercised for the life and health of
the prisoner.  Porter v. County of Cook (1976), 42 Ill.
App.3d 287, 355 N.E.2d 561; see also:  79 A.L.R.3d 1210;
60 Am.Jur.2d, Penal and Correctional Institutions, §17,
p. 821.  As stated in Kendrick v. Adamson (1935), 51 Ga.App.

-5-

402, 180 S.E. 647, "A sheriff owes to a prisoner placed in his custody a duty to keep the prisoner safely and free from harm, to render him medical aid when necessary, and to treat him humanely and refrain from oppressing him."

However, ". . . a jailer is not liable to a prisoner in his keeping for injuries resulting from the prisoner's own intentional conduct [citation omitted.] Absent some possible special circumstances a jailer is under no duty to prevent the latter from taking his own life." Lucas v. City of Long Beach (1976), 60 Cal.App.3d 341, 131 Cal.Rptr. 470.

"Special circumstances" form the basis of virtually every decision involving a jailer's liability for a prisoner's acts of self-destruction.

In Porter v. County of Cook, supra, the plaintiff had been incarcerated in the Cook County House of Correction for threatening to harm his wife. He was physically examined by a county-employed psychiatrist who recommended "that he be admitted to a hospital immediately as an emergency for the protection from physical harm of himself or others." The plaintiff was then placed in an isolated cell where he began hearing voices that threatened him. He yelled for the guards to come to his aid and for medication. None came. The voices kept getting worse and worse. In an attempt to drive the voices away, the plaintiff set his mattress on fire. Soon his hair caught on fire and he started screaming. A guard from two tiers above his cell rescued him, but not before he had suffered severe burns on his face and hands. The Appellate Court of Illinois upheld the trial court's factual determination that the county, which was obligated to provide reasonable care for

-6-

its prisoners, did not do so when its employees failed to strip the defendant, take away his personal effects, and protect him from harming himself.

In the above-discussed case the defendant knew or should have known that the prisoner was suicidal, thereby satisfying the requirement that "special circumstances" exist before liability will attach. But liability is not limited to cases involving prisoners with suicidal histories. For example, numerous courts have held the jailer responsible for the prisoner's actions when the prisoner injures himself because he is in a state of helpless intoxication. Decisions stating that a greater duty is owed when a person is so intoxicated as to be incapacitated for physical or mental effort are: Thomas v. Williams (1962), 105 Ga.App. 321, 124 S.E.2d 409; Barlow v. City of New Orleans (1970), 257 La. 91, 241 So.2d 501; and Shuff v. Zurich-American Ins. Co. (1965 La.App.), 173 So.2d 392.

Finally, a case arising in the neighboring state of North Dakota provides a clear insight into the problem. In Falkenstein v. City of Bismarck (N.D. 1978), 268 N.W. 2d 787, the decedent was placed in a cell known as "the hole" following an incident in which he "foulmouthed" a police officer. The next morning the decedent was found dead, hanging from the cell door bars. The North Dakota Supreme Court, noting the Lucas case, held that substantial evidence existed in the record to support a conclusion that the decedent's suicide was the result of a morbid state of mind proximately caused by his incarceration in "the hole" for an extended period of time.

The North Dakota Supreme Court noted that, "[I]n most situations a death by suicide is not an actionable

-7-

event because, even though there may have been tortious conduct preceding the suicide, the suicide is ordinarily considered as an intentional act and not the result of the tort. This relieves the original actor of liability." Therefore, a plaintiff does not have a cause against a jailer for negligently causing the suicide of a prisoner unless "special circumstances" are offered which elevate the jailer's duty of care and tend to prove that the jailer's acts or omissions constituted the proximate cause of the suicide, rather than the prisoner's own intentional conduct. The jailer is not an insurer of the safety of its prisoners. However, once the jailer knows or should know of the suicidal tendencies of a prisoner, a duty arises to provide reasonable care necessary to prevent the prisoner from committing suicide. The rule applies whether the prisoner is mentally anguished, helplessly intoxicated, or temporarily insane because of conditions forced upon him by the jailer.

Melvin Pretty On Top committed suicide four days after being incarcerated in the Hardin City Jail. He did not have a history of mental disease or emotional disturbances, nor had he attempted suicide previously. His conduct and general demeanor while in jail was normal. There is no evidence in the District Court file that Pretty On Top was suffering from delerium tremens.

Plaintiffs contend the defendants were negligent in the supervision and maintenance of the jail facility, thereby permitting the paring knife to be accessible to Pretty On Top. A similar attempt to impose liability was made in Maricopa County v. Cowart (1970), 106 Ariz. 69, 471 P.2d 265, an action to recover for the suicide of a boy confined in a reformatory. Responding to the allegation that the

-8-

physical plant was negligently constructed, the Supreme

Court of Arizona said:

> ". . . [U]nder the general theory of
> negligence, in order to show liability,
> the plaintiff must prove a causal connection
> between the alleged breach of duty and
> the resulting injury. Here again, the
> proof is nil that any breach of the detention
> home's duty to provide a reasonably safe
> building, if in fact such a breach was shown,
> was the proximate cause of the resulting
> suicide of the deceased. There was absolutely
> no testimony that the structure produced
> or contributed to a morbid state of mind of
> the deceased precipitating his suicide."

Under plaintiffs' theory, it would be necessary to

prove that the jail's security policy caused Pretty On

Top to commit suicide. Plaintiffs' contention that the

security policy made it possible for Pretty On Top to take

his own life is insufficient. Defendants were required to

exercise reasonable and ordinary care for Pretty On Top's

life and health. There was nothing before the District

Court that tended to prove that the proximate cause of the

suicide was anything but the intentional act of Melvin

Pretty On Top. Without a showing of "special circumstances"

which would elevate the defendants' duty of care and thereby

create the possibility that defendants' acts were the

proximate cause of the death, the District Court was required

to follow the general rule that suicide is an intentional

act and grant defendants' motion for summary judgment.

Affirmed.


John L. Sheehy
                    Justice


-9-

We Concur:

_____
Chief Justice

_____

_____
Justices


Justice Daniel J. Shea will file a dissent.

No. 14519

REGINA PRETTY ON TOP, Administratrix
of Estate of Melvin Pretty on Top,

v.

CITY OF HARDIN, and the Chief of
Police.

Dissent of Justice Daniel J. Shea.



FILED

APR 2 6 1979

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

I would reverse the summary judgment and send the case back for trial. There are genuine factual issues involved which must be tried by a jury. This case, contrary to the conclusion of the majority, is controlled by the "special circumstances" which created a higher duty of care than merely that of an ordinary jailer. The City was openly and avowedly running its jail as a de facto detoxification center, and that is the focal point from which we must measure duty, foreseeability, and efficient intervening cause.

The nature of the duty owed to the deceased depends, of course, on the nature of his incarceration. Here the purported legal reason why the city judge ordered the deceased to jail is because he had violated the open container law and could not pay the fine imposed. Consequently, he was ordered to work off the $100 fine in jail, with credit allowed at a rate of $10 per day. The actual reason, however, for the deceased's incarceration was that he was a chronic abuser of alcohol and in the wisdom of the City, he needed detoxification. As the majority has recognized, the deceased was no stranger to the City jail, having been there many, many times before for primary alcohol-related offenses. The majority expressed the true nature of the City jail in the following manner:

> "The Hardin City Jail is used almost entirely
> for detoxification. Of the 300 persons in-
> carcerated in the jail for a twelve month
> period immediately preceding September 1973,
> 98 percent were jailed on alcohol-use offenses.
> Of these offenders, 95 percent of those jailed
> were Native Americans. . ." (Emphasis added.)

Based on these disclosures, I do not understand why the majority refuses to attach special significance to these facts in analyzing the duty which the City owed to the deceased.

-11-

By imposing the $100 fine which the deceased was unable to pay, and then requiring the deceased to pay off the fine at the rate of $10 per day for each day spent in jail, the City starts off with a strike against it. The record before this Court indicates that the deceased was ordered to spend time in jail solely because he did not have the $100 with which to pay the fine. Almost two years before this incident, the United States Supreme Court squarely condemned this practice as a violation of equal protection of the law. Tate v. Short (1971), 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130. Therefore, from the very moment he was sentenced, the deceased was being held illegally.

It appears however, that the actual reason for placing the deceased in jail was that the City in its wisdom, determined that he needed detoxification due to his chronic abuse of alcohol. As the majority has noted, for at least a year immediately preceding the deceased's suicide, the City was using the jail almost exclusively as a detoxification center. This is a far cry from the normal uses to which a City jail is put, and it is for this reason that the normal duty owed by the jailer to the inmates of the jail does not apply. When the City changed the general nature of the use of the jail, it also changed the nature of its duties owed to the occupants of the jail.

The deceased was in essence being treated (however ineptly) as one of many persons with a chronic alcohol abuse problem. It is therefore of no consequence that the City did not know of the deceased's particular propensities to attempt suicide. The City is charged with the general knowledge that chronic alcohol abusers do not act like ordinary prisoners, particularly when they are involuntarily committed. The process of detoxification is a painful

-12-

physical and mental process. One going through this process may develop extreme psychosis, delirium tremens, and is certainly more likely to attempt suicide than the prisoner without this problem. The City is charged with this knowledge because it openly and avowedly ran the jail as a detoxification center. It was not therefore required that the City have specific knowledge that the deceased was a potential candidate for suicide.

Given this general duty imposed upon the City, it is a foreseeable event that a prisoner held as a chronic abuser of alcohol may attempt suicide. It was the duty of the City to take appropriate preventative steps, not simply to prevent the deceased from attempting or committing suicide, but to prevent all occupants from attempting or committing suicide. Absent these preventative measures, the City could not prevent an inmate from either harming another or harming himself. The facts here indicate the City did absolutely nothing to prevent the occupants from harming others or from harming themselves. The City took no steps to determine if weapons or other dangerous instruments were coming into the jail. This is hardly the way to run a detoxification center.

The majority opinion recited the essential facts concerning the lack of jail inspection. Anyone could have slipped a weapon to the occupants of the jail. It is not at all unreasonable to conclude that a weapon finding its way into a jail is either for the purpose of effectuating an escape, harming another, or harming oneself. That a chronic alcoholic may attempt suicide while involuntarily jailed, is a clearly foreseeable event.

-13-

I do not think the status of the trustie who knew the deceased had the knife can be ignored. This knowledge, under the facts of this case, is also chargeable to the City. The trustie knew the deceased had the knife but failed to notify anyone of this potentially dangerous situation. The trustie received a $5.00 credit each day for performing the duties of janitorial work and reporting anything unusual to the officer on duty. If it is not unusual for a jail inmate to have an unauthorized knife, I do not know what is. The trustie, working for the City, became the de facto agent of the City, and his knowledge was properly chargeable to the City. The trustie should have foreseen that the deceased planned to either harm someone else or himself. The aid of the trustie having been enlisted and having granted him special privileges in exchange for this aid, the City cannot now disavow that he was its agent. I stress, however, that even if the trustie did not know the deceased had possession of the knife, an attempted suicide by one undergoing involuntary detoxification, was a forseeable event.

We next get to the question of whether the deceased was responsible for his own act of suicide, thereby exonerating the City. If we accept the proposition that the City owed deceased a duty under the "special circumstances" rule and further accept that the deceased's suicide was foreseeable while confined in a detoxification center, then it would be ludicrous to hold that the City was exonerated simply because the deceased's intentional act intervened. At the very least, it is a question of fact as to whether the deceased was in sufficient control of his mind and faculties such as to absolve the City of any responsibility for his ultimate suicide.

-14-

For the foregoing reasons, I would reverse the District Court and hold that summary judgment was improperly granted.

_____
Justice