ANN MARIE DEZORT DELASKY, Successor Adm'x of the Estate of Frank J. Dezort, Jr., Deceased, Plaintiff-Appellant, v. THE VILLAGE OF HINS-DALE, Defendant-Appellee.

Second District   No. 81—682

Opinion filed October 18, 1982.

LINDBERG, J., dissenting.

George N. Avgeris, of Hinsdale, for appellant.

Stanley J. Davidson, David P. Meyer, and Oliver W. Gregory, Jr., all of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellee.

JUSTICE REINHARD delivered the opinion of the court:

This is the third appeal to this court in this case, wherein, plaintiff, Ann Marie Dezort Delasky, successor administratrix of the estate of Frank J. Dezort, Jr., seeks to recover in a wrongful death action from defendant, the Village of Hinsdale, for the suicide of her father while a prisoner in defendant's village jail. Frank J. Dezort, Jr., was found hanged in his cell on December 21, 1971, and thereafter this action was filed on behalf of the estate alleging the negligence of police officers employed by defendant in failing to exercise reasonable care for the preservation of Dezort's life while in their custody. The trial court originally granted summary judgment in favor of defendant. This court reversed (*Dezort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, 342 N.E.2d 468 (*Dezort I*)) in an opinion which defined defendant's duty of care for the health and life of a prisoner in its jail.

Upon remand, a jury trial was held, resulting in a verdict for defendant and a specific finding that Dezort was guilty of contributory negligence. This judgment was reversed (*Dezort v. Village of Hinsdale* (1979), 77 Ill. App. 3d 775, 396 N.E.2d 855 (*Dezort II*)) on the basis of several instructional errors. The cause was remanded and heard as a bench trial wherein the parties stipulated that the evidence was the record of the prior jury trial in the case. After consideration of the transcript and exhibits of that proceeding, the trial court found no negligence on the part of the defendant, and entered judgment in defendant's favor. Plaintiff appeals, contending that the judgment is contrary to the manifest weight of the evidence.

We summarize only the evidence pertinent to resolve the issue before us on appeal. On or about the 21st of December 1971, Frank J. Dezort, Jr., the decedent, age 43, arrived at his home in the early morning hours. He was described by family members as being drunk, argumentative, and upset. The decedent got into an argument with several family members and pushed his wife. During or just after this argument, the decedent attempted to go into a closet containing rifles and reached for one of the rifles. He was restrained and pulled out of

the closet by two of his daughters. In grabbing for the decedent, one of the daughters noticed that he was wearing a belt in his pant loops. Dezort told his family members that he did not want to hurt anyone anymore and that they should call the police before he did something that he did not want to do.

At approximately 4:50 a.m. two Hinsdale policemen, Patrolman Chester Hall and Sergeant Richard Lyons, arrived at the Dezort residence in response to a call concerning a family disturbance. The family members did not tell the officers about the incident that had occurred before the officers arrived. As the two officers approached the house, they heard shouting from inside. When the two officers entered the front room, the decedent came down the hall shouting at them. He attempted to shove Sergeant Lyons. He grabbed at Officer Hall who pushed him away. At this time the decedent said words to the effect "shoot me and get it over with" or "shoot me or I'll take your gun and do it myself." Officer Hall believed that Dezort was trying to get his service revolver from him, although Officer Hall believed Dezort was playacting and that Dezort was not using all the force he could. The two officers were able to calm the decedent and they took him into the kitchen where he sat at the kitchen table. Both officers were of the opinion that decedent was moderately intoxicated.

The decedent at this time quickly became remorseful, apologetic and depressed, but the officers did not characterize his conduct as crazy or wild. He started crying. Officer Hall felt his conduct was playacting for sympathy. At this point Mrs. Dezort said something to the decedent and he immediately became angry and shouted at her. Lyons told the decedent to "shut up" and the decedent responded by cursing the officer and saying words to the effect "why don't you just shoot me" and "shoot me or I'll take your gun and shoot myself." Officer Hall felt this threat was in a taunting tone of voice. Sergeant Lyons, in response to this, zipped up his outer jacket to cover his service revolver in order to prevent the decedent from obtaining his weapon. At this point the decedent jumped Lyons and grabbed for his gun. Officer Hall moved in to assist and in the scuffle all three men fell to the floor. The decedent then succeeded in grabbing Officer Hall's service revolver, and the two officers managed to disarm the decedent and pin him to the floor. Officer Hall noted at trial that the decedent, who was rather large, did not seem to be putting up much of a fight. Sergeant Lyons, however, indicated that it took both of them to pin the decedent to the floor.

The decedent again became remorseful and apologetic and allowed himself to be handcuffed. While Sergeant Lyons was out of the room,

Officer Hall searched the decedent for weapons. He did not recall whether the decedent was wearing a belt at this time. The two officers then escorted the decedent to a patrol car and placed him in the backseat. Sergeant Lyons drove the decedent to the station house approximately four blocks away while Hall followed in his squad car. The entire incident at the Dezort house took approximately 15 minutes.

The decedent was taken to an interrogation room where he was told that he was going to be charged with disorderly conduct and informed that he could post bail and be released. The decedent said words to the effect that "he did not wish to post bail and that he just wanted to be locked up." The decedent at this time was slightly remorseful and moderately intoxicated. Sergeant Lyons left the room and Officer Hall conducted a quick search of the decedent. Hall was not asked to describe the extent of the quick search. When Sergeant Lyons returned, the decedent emptied his pockets and was told to remove his watch. When the decedent began to argue, the officers allowed him to keep his watch to keep him from "flying off the handle." Sergeant Lyons, who had left the room, testified that he instructed the decedent to take up a position leaning against the wall so that he could be searched. Officer Hall then told him that the decedent had already been searched. Officer Hall's version of this conversation differed slightly in that he testified that Sergeant Lyons told the decedent he would have to take his belt off, and decedent responded by pulling up his shirt and stating he didn't have a belt. Both officers then escorted the decedent to his cell. Officer Hall described decedent's behavior at that time as calm, submissive and apologetic. He told the officers that "he just wanted to get out of the house" and that "his fight was with his family, not with us." Officer Hall said that when decedent was placed in his cell he couldn't detect any effect of alcohol in his speech or walk.

The decedent was placed in a cell at approximately 5 a.m. Later, Sergeant Lyons instructed Officer Hall to look in on the decedent because he had acted or looked a little strange. The officer said he gave this instruction because he wanted to make sure that the decedent was alright and to see if he later wanted to post bail. Officer Hall checked in on the decedent approximately one hour later at a little after 6 a.m. At approximately 7 a.m. Dezort was found dead hanging by the neck from his belt.

Anthony S. Kuharich testified as an expert witness for plaintiff that the Bureau of Detentions Standards and Services of the Illinois Department of Corrections had adopted Municipal Jail and Lock-up

Standards, which had been distributed to the various municipal jails and lock-ups in the State of Illinois. Those standards provided that a prisoner showing any evidence of a mental disorder should not be housed in a municipal jail or lock-up, but rather should be referred to an appropriate facility. The Hinsdale Police Department had adopted in 1966 a local regulation, which read, "Before locking up a male prisoner, an officer shall make a careful search and take from him everything which could be used in effecting an escape, or to injure himself, including necktie, belt, and shoestrings." In response to a hypothetical question, which included as facts to be assumed that the deceased had a belt upon his person, but which question did not describe where the belt was worn or if it was concealed, Mr. Kuharich stated his belief that the search conducted by the police was not complete and was not adequate to this type of defendant. The witness testified that an individual of this kind "should have been very very thoroughly searched."

■ Ordinarily, in reviewing the findings of fact of the trial court in a bench trial in which the evidence is conflicting, a reviewing court will not substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, 382 N.E.2d 1205; *Schwarzwalder v. Waitkoss* (1981), 101 Ill. App. 3d 337, 428 N.E.2d 633.) However, if the evidence before the trial court consists of depositions, transcripts, or is documentary in nature, the appellate court is not bound by the trial court's findings and may make an independent decision on the facts. (*Wolverine Insurance Co. v. Jockish* (1980), 83 Ill. App. 3d 411, 413-14, 403 N.E.2d 1290; *Northern Trust Co. v. Tarre* (1980), 83 Ill. App. 3d 684, 690, 404 N.E.2d 882; *Cassidy v. Luburich* (1977), 49 Ill. App. 3d 596, 600, 364 N.E.2d 315; *Barraia v. Donoghue* (1977), 49 Ill. App. 3d 280, 283, 364 N.E.2d 952.) Accordingly, we have made an independent examination of the stipulated transcript evidence.

In *Dezort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, 342 N.E.2d 468 (*Dezort I*), we held that the duty of law enforcement officers to those who have been arrested and incarcerated under their care is "to exercise ordinary and reasonable care for the preservation of their prisoner's health and life under the circumstances of the particular case." (35 Ill. App. 3d 703, 710, 342 N.E.2d 468; see also *Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoner*, Annot., 79 A.L.R.3d 1210 (1977); Restatement (Second) of Torts sec. 314A(4) (1965).) We further stated that whether the defendant failed to act in accordance with that standard was a question for the trier of fact, and under the facts before us in *Dezort*

*I* summary judgment was improperly granted.

In determining whether there is a breach of the duty owed as stated in *Dezort I*, we must examine whether the defendant here exercised ordinary and reasonable care for the protection of their prisoner's health and life *under the circumstances of the particular case.* In other jurisdictions, courts have looked to "special circumstances" which form the basis of a jailer's liability for a prisoner's act of self-destruction. (*Pretty on Top v. City of Hardin* (Mont. 1979), 597 P.2d 58; *Wilson v. City of Kotzebue* (Alaska 1981), 627 P.2d 623; *Falkenstein v. City of Bismark* (N.D. 1978), 268 N.W.2d 787; *Lucas v. City of Long Beach* (1976), 60 Cal. App. 3d 341, 131 Cal. Rptr. 470.) Such "special circumstances" where a jailer knows or should know of the suicidal tendencies of a prisoner are found in cases where the prisoner is intoxicated (*Wilson v. City of Kotzebue* (Alaska 1981), 627 P.2d 623; *Shuff v. Zurich-American Insurance Co.* (La. App. 1965), 173 So. 2d 392); the condition of the jail is conducive to committing suicide (*Falkenstein v. City of Bismark* (N.D. 1978), 268 N.W.2d 787); or there is a prior history or warning of a suicidal tendency. (*Porter v. County of Cook* (1976), 42 Ill. App. 3d 287, 355 N.E.2d 561.) On the other hand, liability has not been found where the prisoner did not have a history of mental disease or emotional disturbances or attempted suicide previously (*Pretty on Top v. City of Hardin* (Mont. 1979), 597 P.2d 58), or his emotional upset was no different from others who are intoxicated or under the effect of drugs. (*Lucas v. City of Long Beach* (1976), 60 Cal. App. 3d 186, 131 Cal. Rptr. 470.) While some decisions have decided the issue of a jailer's responsibility for his prisoner's suicide under the particular facts under an analysis of intervening act and proximate cause (see, *e.g., City of Belen v. Harrell* (1979), 93 N.M. 601, 603 P.2d 711; *Pretty on Top v. City of Hardin* (Mont. 1979), 597 P.2d 58; *Lucas v. City of Long Beach* (1976), 60 Cal. App. 3d 186, 131 Cal. Rptr. 470), initially we must determine whether the defendant negligently breached its duty to exercise ordinary and reasonable care for preservation of the prisoner's health and life under the circumstances of the particular case. (See *Dezort I*, 35 Ill. App. 3d 703, 710, 342 N.E.2d 468.) That issue is a question of fact to be determined from the evidence adduced at trial.

It is the plaintiff's contention that a careful or thorough search would have disclosed Dezort's belt, and considering the rules and regulations of the Village of Hinsdale Police Department, State Municipal Jail Standards, and the testimony of Anthony Kuharich on good police practice on searches of prisoners, the defendant was negligent. The defendant argues that under the circumstances of the case the search

of Dezort was sufficient.

While this is a close case, we agree with the trial court that the defendant was not negligent under the facts of this particular case. First, we believe that from the evidence it is not unreasonable to conclude that Dezort was not a suicide risk. Officer Hall testified that when Dezort was placed in his cell he could not detect any effect of alcohol in Dezort's speech or walk. He further described Dezort's behavior then as calm, submissive and apologetic. No past history of mental illness or past suicidal tendencies were communicated to or known to the officers, nor is any such evidence present in the record. The evidence of a suicidal tendence most strongly relied upon by the plaintiff is Dezort's two statements at the home to the effect shoot me or I'll take the gun and shoot myself, followed on the second occasion by his grabbing of Officer Hall's gun. However, the statements were uttered in a taunting tone toward the officers in the family home during an emotional family argument probably not uncommon in the ordinary investigation of domestic disputes by police officers. Also, it is not unusual for a physical confrontation with investigating officers particularly by one who may be intoxicated and upset over a family matter. Moreover, Officer Hall felt some of Dezort's actions may have been "playacting" for sympathy. Police officers generally are not equipped to recognize and analyze emotional problems of persons charged with crimes and particularly those who may appear to be intoxicated. (See *Dezort I* (1976), 35 Ill. App. 3d 703, 709-10, 342 N.E.2d 468.) Under these facts, the police officers exercised ordinary and reasonable care for their prisoner.

Concluding that Dezort's conduct at his home and later at the jail gave rise to no special circumstances which might alert the defendant's police officers that Dezort was a suicide risk, we must examine whether, alone, the failure to find his belt with which he hanged himself was a breach of the duty to exercise ordinary and reasonable care for the life of their prisoner. There was in existence a rule of the Village of Hinsdale Police Department requiring that before locking up a male prisoner, "an officer should make a careful search and take from him everything which could be used in effecting an escape or injure himself, including necktie, belt and shoestrings." Also, Anthony S. Kuharich testified as an expert witness for plaintiff that the search conducted by the police was not complete and adequate for this type of defendant. Violation of a statute or ordinance designed for the protection of human life or property is *prima facie* evidence of negligence, but a violation does not constitute negligence *per se*, for the evidence of negligence may be rebutted by proof that the party acted

reasonably under the circumstances, despite the violation. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93.) Here it is contended by plaintiff that since the search failed to disclose the belt, it was not a careful search, thereby violating the department rule which constituted negligence by the officers. Defendant argues that the circumstances of the case govern the type of and thoroughness of the search. We agree with the defendant that under these facts the officers acted reasonably and the search was sufficient to satisfy the village police department rule.

According to Officer Hall, two searches of the decedent were conducted. The first took place at the Dezort home and was conducted to check for weapons. At the police station, Hall had Dezort empty his pockets and himself made a quick search of the decedent. Additionally, Hall testified that when Sergeant Lyons told Dezort he would have to take his belt off, decedent held up his shirt and said he did not have a belt. From our examination of the record of the questioning of Officer Hall, it does not reveal the technique used by Hall in conducting the quick search. Instead he was primarily examined by plaintiff under section 60 about whether a belt could be concealed so as to avoid detection. Officer Hall conceded that it would have been possible to feel a concealed belt through the material of the decedent's clothing, but that "in most searches, you inadvertently skip areas." Moreover, Hall stated that if the belt had been tightly rolled, it could have been concealed in the decedent's crotch or the area between the buttocks and not disclosed even during a pat search. Hall testified that a partial strip search would have disclosed the belt. Anthony S. Kuharich, plaintiff's expert, testified that under the facts, a careful and thorough pat search would have required the officer to search the prisoner with two hands, touching every part of his body. The officer should have searched the waistband very carefully for any materials secreted here and then have searched down each leg and into the crotch in the front of his groin, and his buttocks. He should examine every crevice. If the officer was not satisfied, or if a belt which the officer believed present had not been discovered, a partial strip search or a full strip search should be conducted.

■■ Whether the officers were negligent depends upon whether they exercised ordinary and reasonable care for the preservation of Dezort's health and life under the circumstances of this particular case. Here they were dealing with a family disturbance. Two searches of Dezort and questioning of him about his belt took place. He was charged with the misdemeanor offense of disorderly conduct. There was no prior history of suicidal tendencies or an express present

threat of suicide. He appeared calm and submissive at the time he was placed in his cell. Under all the circumstances of this particular case, we reach the same conclusion as the trial judge did that the officers were not negligent. We will not find negligence just because the belt with which Dezort hanged himself was not found in the search conducted by the officers. Rather, in reviewing all the facts, including the type of offense the officers were investigating and Dezort's entire conduct from the initial encounter to his eventual incarceration, we find the search conducted by the officers was in the exercise of ordinary care for their prisoner. We do not feel a partial or full strip search was warranted under these facts. We note that under current law, not in effect at the time of this occurrence, that "[n]o person arrested for a traffic, regulatory or misdemeanor offense, except in cases involving weapons or a controlled substance, shall be strip searched unless there is a reasonable belief that the individual is concealing a weapon or controlled substance." (Ill. Rev. Stat. 1981, ch. 38, par. 103—1(c).) Accordingly, we find the officers' conduct was not negligent under the record before us, and we need not decide whether the decedent was contributorily negligent or his injuries were proximately caused by the defendant's negligence.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

VAN DEUSEN, J., concurs.

JUSTICE LINDBERG, dissenting:

I respectfully dissent because I find a breach of duty in the failure to discover and confiscate the belt in two searches which were not shown to be adequate under the circumstances. I agree this is a close case. But in making an independent examination of the record, as this court is allowed to do, I find that the preponderance of the evidence taken as a whole supports the plaintiff.

I do not mention lightly the fact that the evidence must be viewed as a whole. The majority first focuses on decedent's conduct to determine if it might have alerted the police officers. Then, having concluded that there were "no special circumstances" in decedent's behavior, the majority goes on to examine whether—"alone"—the searches were adequate. The case is not so easily dissected.

The evidence showed that the police arrived at decedent's home to quell domestic violence. Twice decedent grabbed for one of their guns. Both times he expressed a desire to kill himself. On one of

those occasions, a violent exchange took place. It was obvious to the officers that decedent was at least moderately intoxicated. It is under those circumstances, among others, that the reasonableness of the searches must be examined.

The officers testified that they did not take decedent's actions seriously. They thought decedent was taunting them or was playacting. First, I question whether a police officer should ever dismiss an express death threat so lightly, especially when coupled with overt action. Second, I am at a loss to understand why Officer Lyons would zip up his jacket if he thought decedent was merely playacting.

The first search took place at decedent's home. The officer in this search was concerned only with confiscating weapons in order to effectuate the arrest. The second search took place in the police station prior to decedent's incarceration. The search was admittedly "quick," and as one officer put it, "in most searches, you inadvertently skip areas."

In any event, the belt was not found. Perhaps it was hidden in decedent's groin area or between the cheeks of decedent's buttocks, as suggested by the officers. No matter, it should have been found. We are not dealing with a pill, a razor blade or even a pocket knife. We are dealing with the 43-inch belt of a 200- to 225-pound man. Rolled up, folded over or otherwise just unwound as usual, a careful pat search should have discovered it. And that is so even if it was hidden in one of the discreet areas suggested by the officers.

The regulations of the police department required a "careful search" to find, among other things, items with which a prisoner might hurt himself, such as a belt. Violation of such a regulation can constitute *prima facie* evidence of negligence. *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380.

Plaintiff's expert testified that a careful and thorough search would have disclosed the belt no matter where it may have been hidden. I agree. Accordingly, I find a breach of the duty expressed in *Dezort I* (1976), 35 Ill. App. 3d 703, 342 N.E.2d 468, that a police officer has a duty to exercise ordinary and reasonable care to preserve the life and health of his prisoner.

Having determined that the officers breached their duty of care, I must address the trial court's further finding that there was no proximate causation. But for the officer's failure to confiscate the belt, decedent would have been severely hampered, if not thwarted, in his attempt to kill himself. It was reasonably foreseeable to the officers that the failure to confiscate a belt could facilitate the suicide of decedent. Indeed, department regulations suggest that one reason an offi-

cer should confiscate a belt is to prevent a prisoner from harming himself. Therefore, I find proximate causation.

Although the trial court further found decedent capable of exercising due care for his own safety, there is no indication decedent was found to have not exercised such care.

Accordingly, I would reverse the order of the circuit court of Du Page County and proceed to a determination of damages.