*In re* MARRIAGE OF ELIZABETH THORNTON, Petitioner-Appellant, and EDMUND B. THORNTON, Respondent-Appellee.

First District (4th Division)   No. 83—2839

Opinion filed October 17, 1985.—Rehearing denied December 18, 1985.

Craig Armstrong, of Ottawa, and Patrick Mazza and Mary Beth Wheeler, both of Arnstein, Gluck, Lehr, Barron & Milligan, of Chicago, for appellant.

Robert W. Wilcher, of Schiller, Du Canto & Fleck, Ltd., of Chicago (Robert P. Sheridan, of counsel), for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

This is the second appeal concerning the disposition of marital property in the divorce proceedings between the petitioner, Elizabeth M. Thornton, and the respondent, Edmund B. Thornton. In 1977, the circuit court dissolved the parties' marriage and later in 1978, entered judgment on the property, maintenance and child support issues. In

the initial distribution of marital property, Elizabeth was awarded a substantially smaller portion of the marital property than that which was awarded to Edmund. Elizabeth was also awarded approximately $48,000 a year in unallocated child support and maintenance. We reversed the award of maintenance/child support and the division of marital property and remanded to the trial court with instructions that Elizabeth receive a greater share of marital property and/or maintenance/child support. *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336.

At the second hearing before the trial court, Elizabeth received approximately 62% of the marital property. She was also awarded $48,000 a year in maintenance and child support with provisions that it be reduced by $500 per month as each of the four minor children either finished high school or turned 18 years old, whichever occurred later. Elizabeth appeals from the result on remand.

Elizabeth first challenges the division of marital property. Elizabeth argues that the trial court in effect awarded her a lesser amount of marital property, in violation of this court's mandate to award her a greater share of the marital property than Edmund, as the assets she received produced little income in comparison to the assets awarded to Edmund.

In 1978, the trial court initially distributed the parties' property as follows:

### 1978 JUDGMENT

#### EDMUND B. THORNTON'S NONMARITAL PROPERTY:

| | |
|---|---|
| Ottawa Silica Co. stock: | |
| 510 shares, Common | $51,510.00 |
| 570 shares, 2nd Preferred | 16,920.00 |
| Thornwood Estate | 250,000.00 |
| Interests in 10 "family" trusts: | undetermined |
| TOTAL: | $318,430.00 |

#### ELIZABETH THORNTON'S NONMARITAL PROPERTY:

| | |
|---|---|
| Securities | $68,000.00 |
| Jewelry and Furs | 61,000.00 |
| Furniture and Auto | 7,000.00 |
| Checking and Savings Accts. | 850.00 |
| TOTAL: | $136,850.00 |

| MARITAL PROPERTY | TO ELIZABETH | TO EDMUND |
|---|---|---|
| Miscellaneous Securities | $7,512.00 | $7,512.00 |
| Pension and Profit Sharing | | 109,000.00 |
| Calif. proceeds (Diamond J) | 35,500.00 | 35,500.00 |
| Four automobiles | | 6,200.00 |
| Houseboat | | 7,500.00 |
| Three La Salle Co. Farms | | 233,600.00 |
| Coin Collection | | undetermined |
| Stamp Collection | | undetermined |
| Gun Collection | | undetermined |
| Cash | 20,000.00 | |
| Indebtedness | | $290,540.00 |
| Household Furnishings | * | * |
| Life Insurance | * | * |

ELIZABETH THORNTON'S
MARITAL PROPERTY:                    $63,012.00

EDMUND B. THORNTON'S
MARITAL PROPERTY:                                      $108,772.00

ELIZABETH THORNTON'S
TOTAL PROPERTY:                      $199,862.00

EDMUND B. THORNTON'S
TOTAL PROPERTY:                                        $427,202.00

In 1983, the second distribution on remand was made accordingly:

### 1983 JUDGMENT

ELIZABETH THORNTON'S NONMARITAL PROPERTY:

| | | |
|---|---|---|
| 1. | Cash in Bank Acct. | $1,886.00 |
| 2. | Merrill Lynch Cash Mgmt. Acct. | 165,661.00 |
| 3. | El Paso Natural Gas stock | 235.00 |
| 4. | Englehart Minerals stock | 188.13 |
| 5. | Philbro stock | 3,414.13 |
| 6. | Ottawa Silica Company stock | 1,200.00 |

| | | |
|---|---|---|
| 7. | Mercedes Auto | 12,000.00 |
| 8. | Jewelry | 106,300.00 |
| 9. | Inherited Furniture | 1,230.00 |
| 10. | Debt to Travel School | (1,700.00) |

ELIZABETH THORNTON'S
NONMARITAL NET WORTH     $290,414.26

## EDMUND B. THORNTON'S NONMARITAL PROPERTY:

Ottawa Silica Company stock:

| | | |
|---|---|---|
| 1. | 775 shares, Common | $465,000.00 |
| 2. | 645 shares, 2nd Preferred | 64,500.00 |
| 3. | Thornwood Estate | 250,000.00 |
| 4. | Interests in nine "family" trusts: | $1,350,849.00 |
| 5. | Cash in two Bank Accts. | 7,164.46 |
| 6. | Ottawa National Bank stock | 11,000.00 |
| 7. | Bryan Production Company | 4,276.50 |
| 8. | Ottawa Silica Retirement Plan | 53,385.70 |
| 9. | Ottawa Silica Profit Sharing | 67,135.62 |
| 10. | Condominium | 80,900.00 |
| 11. | Coins and Medals Collection | 12,473.35 |
| 12. | Handgun Collection | 51,970.00 |
| 13. | Rifle Collection | 1,625.00 |
| 14. | Ship Models | 3,225.85 |
| 15. | Porcelain Statuary | 8,500.00 |
| 16. | Figurine Collection | 5,250.00 |
| 17. | Automobiles (two) and Boat | 31,500.00 |
| 18. | Furniture and Fixtures | 29,259.00 |
| 19. | Furniture and Fixtures | 31,353.00 |
| | Liabilities (Total) | ($550,175.50) |

EDMUND B. THORNTON'S
NONMARITAL NET WORTH     $1,979,191.98

| MARITAL PROPERTY ALLOCATION: | TO ELIZABETH THORNTON | TO EDMUND THORNTON |
|---|---|---|
| A. United Keno Mines stock | | $825.00 |
| B. Tech B stock | | 450.00 |
| C. Ottawa National Bank stock | | 2,750.00 |
| D. Ottawa Silica Retirement Plan | | 33,587.12 |

| | | |
|---|---|---|
| E. Ottawa Silica Profit Sharing | | 114,040.16 |
| F. Big Bend Gun Club membership | | 10,000.00 |
| G. Diamond J. Ranch proceeds | | 30,000.00 |
| H. Marten Farm (78 acres) | $234,000.00 | |
| I. Deiser Farm (74 acres) | 222,000.00 | |
| J. Wooded Lot (36 acres) | 25,200.00 | |
| K. Coins and Medals Collection | | 31,250.85 |
| L. Stamp Collection | | 1,277.90 |
| M. Handgun Collection | | 32,375.00 |
| N. Rifle Collection | | 33,160.00 |
| O. Wine Collection | 19,042.00 | 12,079.00 |
| P. Statuary | 16,100.00 | 940.00 |
| Q. Ship Models | | 4,488.75 |
| R. Figurine Collection | | 5,250.00 |
| S. Jewelry | | 738.00 |
| T. Haitian Paintings | | 734.25 |
| U. Cash Value of Life Insurance | | 43,783.00 |
| V. Three Automobiles | | 7,500.00 |
| W. Ottawa Bank Mortgage | ($65,340.00) | |
| X. Northern Trust Company loan | | ($123,500.00) |
| Y. Furniture and Furnishings | 79,583.00 | 83,719.00 |

NET VALUE OF
ELIZABETH THORNTON'S
MARITAL PROPERTY·            $530,585.00

ELIZABETH THORNTON'S
PERCENT OF MARITAL
PROPERTY:            62.1%

NET VALUE OF EDMUND B.
THORNTON'S MARITAL
PROPERTY            $324,448.33

EDMUND B. THORNTON'S
PERCENT OF MARITAL
PROPERTY:            37.9%

Comparing the two judgments, Elizabth gained in 1983 the three La Salle County farms valued at $234,000, $222,000 and $25,200, a wine collection and a statuary collection valued at $19,042 and $16,100, respectively. She lost approximately $7,500 in miscellaneous securities, approximately $82,000 worth of household furnishings, and $35,000 from the proceeds from the sale of California real estate. The net result was that the value of her marital property award increased from 36.7% of the marital estate in 1978 to 62.1% of the total marital estate in 1983. In contrast, Edmund's portion of the award of marital property decreased from 63.3% in 1978 to 37.9% of the marital estate in 1983. Therefore, Elizabeth was awarded a disproportionate share of the marital estate.

Notwithstanding this apportionment by the trial court, Elizabeth contends that as the marital property awarded to her only produces $3,000 to $4,000 a year in income, which is offset by $14,000 in annual payments on a $65,340 mortgage on one of the La Salle County farms, the trial court in effect awarded her an even smaller proportion of the marital estate than what she had received in the first judgment. We reject this argument.

In the first appeal, we found that as the economic circumstances and earning capacities of the parties was disparate, Elizabeth was entitled to a disproportionate share of the marital estate. The trial court here did precisely that in following this court's directions in the distribution of the parties' marital property. While only a small portion of her awarded marital property could be readily characterized as income-producing at the present time, Elizabeth can liquidate these assets and reinvest the proceeds into assets which do produce income. Elizabeth has received a substantial share of valuable marital property amounting to over $½ million, which she can potentially reinvest and upon which she can realize a reasonable rate of return. (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 971, 441 N.E.2d 367.) We conclude that the apportionment of marital property made by the trial court did not constitute an abuse of discretion. *In re Marriage of McNeeley* (1983), 117 Ill. App. 320, 326, 453 N.E.2d 748.

Furthermore, the trial court may award maintenance, as it did here, if the spouse seeking maintenance lacks sufficient property to provide for her reasonable needs, is unable to be self-supporting, or is otherwise without sufficient income. Ill. Rev. Stat. 1983, ch. 40, par. 504(a).

The trial court essentially reaffirmed its previous award of approximately $48,000 a year in unallocated maintenance and child support with the exception that the award would decrease as the children

turned 18 years old or August 31 of the year of their high school graduation. The trial court provided that maintenance would continue at least through August 1986 and, thereafter the court would review the circumstances to determine if further maintenance was required.

■ In this respect, we find Elizabeth's next argument that the trial court's award of unallocated maintenance and child support was insufficient to be unpersuasive. Taking into consideration the award of marital property, the award of maintenance here was appropriate. The trial court in awarding maintenance properly considered the increased award of marital property and the changed circumstances since the entry of the first judgment. (*In re Marriage of Fuggiti* (1985), 130 Ill. App. 3d 190, 474 N.E.2d 386.) The court found that since the time of the first judgment five years earlier the four children, two of whom were now 18, were no longer living at home but were enrolled in boarding schools paid by Edmund; that Elizabeth's nonmarital assets had more than doubled since the time of the first judgment; that the parties were married for less than 13 years and were now divorced for six years; that Elizabeth had received more than five years of unallocated maintenance of $48,000 per year; and that Edmund no longer voted a majority of the outstanding shares of Ottawa Silica stock as he did at the time of the first judgment.

By awarding Elizabeth maintenance up until August 1986, the award takes into consideration Elizabeth's ability to realize the income-earning potential of her assets (see *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 631-32, 450 N.E.2d 1229), while at the same time giving her an economic cushion before that income-earning potential could be realized and providing the court with an opportunity to review and reassess the award at the end of August 1986 to determine if Elizabeth has been able to achieve the desired goal of self-sufficiency. (*In re Marriage of Reed* (1981), 100 Ill. App. 3d 873, 876-77, 427 N.E.2d 282.) Accordingly, we find that the trial court's award of maintenance was proper.

■ Further, we find no merit in Elizabeth's contention that the denial of her discovery requests mandates reversal of the judgment. Elizabeth generally asserts that the trial court prevented her from discovering relevant information on the parties' standard of living maintained during the marriage and the value of Edmund's nonmarital property and income, in particular, the value of the Ottawa Silica stock.

A trial court has broad discretion in ruling on discovery matters, and its orders on appeal will not be overturned absent a manifest abuse of discretion. (*Mistler v. Mancini* (1982), 111 Ill. App. 3d 228,

233, 443 N.E.2d 1125.) Aside from Elizabeth's general assertions, she has not demonstrated how the requested discovery was relevant to the issues on remand. Therefore, considering the extensive discovery which had been allowed by the trial court, and absent an affirmative showing of abuse, we find no basis for reversal on this issue.

We next consider Elizabeth's contention that the trial court abused its discretion in requiring her to pay her own attorney fees.

The trial court entered an order requiring Elizabeth to file her petition for attorney fees under section 508 (Ill. Rev. Stat. 1983, ch. 40, par. 508) by October 16, 1982, and setting the date for hearing on October 19. Elizabeth moved to continue *sine die* the filing of her petition on fees because she was engaged in "ongoing discussions" with her attorneys over the payment of fees and that if an agreement was reached regarding payment it would not be necessary to petition the court for fees. She alleged in her petition that she owed her attorneys approximately $175,000 to date. The trial court denied the motion to continue and set November 15, 1982, for the hearing on fees and ordered Elizabeth to file a petition by November 1. No petition was filed, and on November 24, 1982, the trial court, after denying Elizabeth's motion to reconsider, closed the proofs on the issue of attorney fees. On November 10, 1983, the trial court, after dividing the parties' marital property and awarding maintenance/child support, directed that in the absence of a petition for fees each party is to be responsible for the payment of his or her own attorney fees.

▮▮ Elizabeth initially argues that the trial court erred in requiring her to file the petition for attorney fees prior to the disposition by the trial court of the marital property and the award of maintenance/child support.

Section 508(a) (Ill. Rev. Stat. 1983, ch. 40, par. 508(a)) empowers the trial court to require one spouse to pay the other spouse's attorney fees and costs, after due notice and hearing, and "after considering the financial resources of the parties." Consequently, as this requires a comparison of the parties' respective financial resources, the awarding of attorney fees under this section is dependent upon the ultimate division of property. (*In re Marriage of Derning* (1983), 117 Ill. App. 3d 620, 625, 453 N.E.2d 90.) Therefore, while the trial court should consider the property received by each party and their overall economic status before allocating responsibility for payment of attorney fees, there is nothing in this section to prohibit the trial court from requiring the petition on fees to be filed and the hearing to be held prior to the disposition of the property and maintenance/child support issues. Thus, we find that the trial court did not err in requir-

ing Elizabeth, in the interest of expediting this already protracted litigation, to file her petition for fees at this time. Nor was it error for the trial court not to conduct a hearing at this time in the absence of a properly filed petition for fees under section 508 and a request for an evidentiary hearing on this issue. *In re Marriage of Lord* (1984), 125 Ill. App. 3d 1, 6-7, 465 N.E.2d 151; *Scott v. Scott* (1979), 72 Ill. App. 3d 117, 126, 389 N.E.2d 1271.

Notwithstanding the above, Elizabeth also contends that as the trial court was informed that she was disputing the approximately $175,000 in fees allegedly owed to her present attorneys and that she might need to retain independent counsel to represent her on the petition for fees, the trial court erred in barring her from ever petitioning for fees.

■ While the trial court was correct in denying Elizabeth's request for fees based upon her counsel's repeated failure to file a petition for fees, in view of the large estimate of fees being requested by her present counsel and Elizabeth's present lack of liquidated assets, to require her to pay her own attorney fees could possibly strip her of her economic stability. Under these circumstances, we find it equitable and appropriate to remand the matter to the trial court to allow Elizabeth another opportunity to file her petition for fees in accordance with section 508 and for the court to conduct a hearing on such petition.

■ Elizabeth further contends that the trial court erred in denying her motion to disqualify Edmund's law firm from representing him in the divorce proceedings.

On June 8, 1982, Elizabeth moved to disqualify the law firm of Schiller and DuCanto from representing Edmund on the basis that the subsequent association of former Judge Charles Fleck, who had earlier denied a number of Elizabeth's discovery requests, created the appearance of impropriety in violation of Canon 9 and Rule 9—101(a) of the Code of Professional Responsibility. (87 Ill. 2d Canon 9; R. 9—101(a).) Former Judge Fleck had heard motions relating to this litigation from August 1981 until February 1982, when he assigned the cause to Judge Meehan on February 25, 1982. The trial on the remanded issues was commenced on April 12. Elizabeth's motion for disqualification was filed midtrial after, she claimed, she had first discovered the subsequent association of former Judge Fleck with Edmund's law firm.

In an affidavit, attached to Edmund's response to her motion, former Judge Fleck stated that he had first been approached about employment with Schiller and DuCanto on March 14, 1982, and that

he had begun negotiations with the firm two weeks later. On May 23, 1982, he tendered his resignation from the bench, which became effective June 1, 1982, the day he stated he first became associated with Schiller and DuCanto. Also included with Edmund's response to the motion was an office memorandum circulated by Schiller and DuCanto among its employees, dated May 26, 1982, directing that former Judge Fleck was not to be consulted on the instant case and that his access to the case files was prohibited. Following arguments on the motion, the trial court denied the motion to disqualify.

Canon 9 of the Illinois Code of Professional Responsibility directs that a lawyer should avoid even the appearance of professional impropriety. Rule 9—101(a) bars a lawyer from accepting private employment "in a matter upon the merits of which he has acted in a judicial capacity." The Illinois Code is modelled upon the American Bar Association (ABA) Code of Professional Responsibility (1977). (87 Ill. 2d art. VIII, Committee Comment, Preface.) Rule 9—101(a) of the Illinois Code was retained without change from Disciplinary Rule 9—101(A) of the ABA Code. 87 Ill. 2d Canon 9, Committee Commentary.

However, both parties fail to mention that the ABA Code has been replaced in August 1983 by the ABA Model Rules of Professional Conduct. (Model Rules of Professional Conduct (1983).) Under the present ABA Rules, former Disciplinary Rule 9—101(A) is now Rule 1.12 and provides as follows:

"(a) Except as stated in paragraph (d) a lawyer shall not represent any one in connection with a matter in which the lawyer participated personally and substantially as a judge *** unless all parties to the proceeding consent after disclosure.

                              * * *

(c) If a lawyer is disqualified by paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in the matter unless:

(1) The disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and (2) written notice is promptly given to the appropriate tribunal to enable it to ascertain compliance with the provisions of this Rule." Model Rules of Professional Conduct Rule 1.12 (1983).

A significant change from the former ABA Code is the addition of a screening procedure to avoid automatic disqualification of a former judge's law firm. This screening procedure, which parallels Rule 1.11 of the ABA Rules, dealing with former government lawyers in private practice, was added in an effort to balance between the competing

considerations of the appearance of impropriety and the risk that too severe a disqualification rule would act as a deterrent against lawyers entering public service. Model Rules of Professional Conduct Rule 1.11, comment; Rule 1.12, comment (1983).

It is acknowledged by the parties that former Judge Fleck's activity with the case disqualifies him from representation under Rule 9—101(a) of the Illinois Code. The issue is whether the disqualification extends to former Judge Fleck's law firm. We hold that disqualification was not required in the instant case.

We recognize the concerns voiced by Elizabeth of the legitimate need to discourage judges from handling matters in such a way as to encourage their own future employment and of the desirability of maintaining public confidence. However, we do not believe that to apply an inflexible extension of the rule of disqualification throughout an entire firm on the appearance of impropriety alone would serve the public interest in maintaining judicial integrity. Rather, to allow disqualification would have serious consequences for this litigation, by depriving Edmund of counsel of his own choosing and in unduly delaying resolution of this cause if a motion to disqualify were allowed mid-trial.

The present Illinois Code requires that, at least in so far as former government attorneys are concerned, the only instances in which the attorney's entire firm is automatically disqualified is where the attorney is personally disqualified for conflict of interest under Rule 5—105(d). (See 87 Ill. 2d R. 9—101(b), Committee Commentary; R. 5—105(d), Committee Commentary.) We believe that similarly a former judge's personal disqualification mandated by Rule 9—101(a) does not automatically result in the disqualification of his firm. See ISBA Committee on Professional Ethics, Opinion No. 800, 72 Ill. B.J. 41 (July 15, 1983).

While Illinois has yet to adopt the new ABA Rules, we believe that the screening procedures outlined in the new Rules adequately dissipate the appearance of any impropriety which might otherwise exist. In the instant case, the screening procedures followed, the adequacy of which Elizabeth does not challenge, were appropriate to remove any appearance of impropriety here. Accordingly, we conclude that the trial court's denial of the motion to disqualify was proper.

Finally, Elizabeth contends that the trial court erred in refusing to classify Thornwood Mansion and the appreciation of Ottawa Silica Company stock as marital assets.

Thornwood Mansion, the family home, was classified in the first trial as being nonmarital property. (See *In re Marriage of Thorn-*

*ton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336.) Elizabeth now maintains that the use of marital funds to renovate and improve the property has transmuted Thornwood to marital property. In support of this theory, she relies on *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 427 N.E.2d 1239, decided after the first appeal, which held that contributions from marital property to pay improvements for nonmarital property raised a rebuttable presumption that the property was transmuted to marital property. (86 Ill. 2d 518, 531-33, 427 N.E.2d 1239.) However, the *Smith* decision was decided prior to the amendment of section 503(c) by Public Act 83—129, effective August 19, 1983. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c).) Section 503(c), as amended, presently alters the concept of transmutation as set forth in *Smith*. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c), Supplement to Historical & Practice Notes, at 59 (Smith-Hurd Supp. 1985).) Section 503(c) now provides that when marital funds are contributed to nonmarital property, the nonmarital property retains its classification and the marital funds are transmuted to nonmarital. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(1).) To fairly compensate for the contributions which are transmuted, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(2).) Therefore, under amended section 503(c) Thornwood was not transmuted into marital property and the marital estate would only be entitled to reimbursement for the marital funds expended.

Since section 503(c), as amended, superseded *Smith*, there is no legal foundation for Elizabeth's argument that Thornwood was transmuted into marital property based upon that decision. Furthermore, Elizabeth has never claimed, either before the trial court or before this court upon review, that section 503(c) worked any change upon the trial court's previous classification of Thornwood as nonmarital property (although she did contend before the trial court that the amendments to section 503(c) affected the classification of the Ottawa Silica stock). Accordingly, we find no basis for reversal of the trial court's decision in this regard.

■ Elizabeth also argues that the trial court should have found the appreciation in the value of the shares of Ottawa Silica Company stock to be marital property due to Edmund's "marital energies" in managing the company during their marriage under section 503(c)(2). (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(2).) In the first trial, as with Thornwood, the Ottawa Silica stock was classified as Edmund's nonmarital property. See *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336.

Section 503(c) provides in part:

"*** when a spouse contributes personal effort to non-marital property, the contributing estate shall be reimbursed from the estate receiving the contribution *** [where] the effort is significant and results in substantial appreciation of the non-marital property. Personal effort of a spouse shall be deemed a contribution by the marital estate." Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(2).

Elizabeth claims that Edmund, as chief executive officer of Ottawa Silica, exerted considerable "personal effort" in the management of the company during the marriage, which resulted in the appreciation of the nonmarital stock. She contends that such appreciation of the stock is to be considered a marital asset. We disagree.

Elizabeth does not dispute the trial court's determination that Edmund's salary constituted adequate and substantial compensation for the services he provided to the company. Instead, she contends simply that because the stock appreciated considerably in value between the years 1965 and 1982, the marital estate is entitled to reimbursement for those increases in value. Elizabeth failed to show, however, that these increases were extraordinary or that they resulted from Edmund's personal efforts. Consequently, she did not demonstrate that "the effort *** results in substantial appreciation of the nonmarital property." (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(2); see Feldman & Fleck, *Taming Transmutation: A Guide to Illinois' New Rules on Property Classification & Division Upon Dissolution of Marriage*, 72 Ill. B.J. 336, 343-44 (1984).) Consequently, we find Elizabeth's allegation of error insufficient ground to reverse the judgment of the trial court.

For the reasons set forth above, that portion of the judgment of the circuit court requiring Elizabeth to pay her own attorney fees is reversed and remanded for further proceedings. In all other respects, the judgment is affirmed.

Reversed and remanded.

JOHNSON and McMORROW, JJ., concur.